**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 13** |
| **Sandra Boggs Colston,** | ) | |
| | ) | **Case No. 15-70654** |
| **Debtor.** | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on confirmation of a Chapter 13 Plan filed by the

Debtor, Sandra Boggs Colston (the "Debtor" or "Ms. Colston").   Confirmation of the plan is

supported by the Chapter 13 Trustee, Christopher T. Micale (the "Chapter 13 Trustee").  An

objection to confirmation and motion to dismiss were filed by Jacqueline Fay Alexander ("Ms.

Alexander"), a disputed creditor of the Debtor, based on lack of good faith and lack of

feasibility.  Notwithstanding the Chapter 13 Trustee's recommendation in favor of confirmation,

this is essentially a two-party dispute involving allegations of undue influence, fraud, and willful

and malicious injury to property by the Debtor.  A lengthy evidentiary hearing was conducted on

confirmation, the objection, and the motion to dismiss on September 16, 2015.  For the reasons

set forth below, the Court will sustain the objection to confirmation and dismiss this case.

## FINDINGS OF FACT [1]

Ms. Colston moved to Grayson County, a rural county in southwest Virginia, in 2012,

where she currently works as a special education teacher.  There, she formed three separate

limited liability companies:  Kickin Chicken Poultry & Game Bird Farm, LLC was established to

sell poultry locally raised by Ms. Colston; Farmers Friend Old Time General Store, LLC was

---

[1] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact.  *See* Fed. R. Bankr. P. 7052, 9014(c).

established to run a general store, café, and coffee shop; and S. Colston Properties, LLC was

formed to own the real estate where the general store operated.  The businesses are now each

defunct.

Prior to moving to Grayson County, the Debtor lived in Virginia Beach, Virginia,

approximately 300 miles to the east, for most of her life.  In Virginia Beach, she worked for the

public school system, also as a teacher, having taught for a total of 23 years.  In the course of her

teaching in Virginia Beach, she became acquainted with Ms. Alexander, a teacher's aide.  Both

worked at Princess Anne High School in Virginia Beach, where the Debtor was a special

education teacher.  Testimony at trial, including that from Ms. Alexander's sister, Judy Walsh

("Ms. Walsh"), indicated that, due to a near drowning accident as a child, Ms. Alexander became

mentally impaired, which Ms. Alexander herself described as a "learning disability."  Ms. Walsh

also described her sister as "slow."  Ms. Walsh further described her sister as "gullible," and

unsophisticated in handling money, sometimes having trouble recognizing the differences in

dollar values.  Ms. Walsh related one specific instance of Ms. Alexander having an issue

distinguishing between $100.00 and $10,000.00.  Despite her intellectual challenges, Ms.

Alexander was able to obtain a certificate to be a teacher's aide,[2] which led her to Princess Anne

High School, where she met and became personally close to Ms. Colston.

Ms. Alexander's parents owned and operated a successful electrical contracting company

in Virginia Beach.  Until her death in 2010, Ms. Alexander's mother managed Ms. Alexander's

finances.  Ms. Alexander's father had predeceased her mother.  In addition to income from a

trust that was set up for the benefit of the three children in the family, including Ms. Walsh and

---

[2] Ms. Alexander testified that she obtained special accommodations from the professor at the community college
where she obtained her teacher's aide certificate, which included recording the classes.  Ms. Alexander further
testified that she would take the recordings home and have her sister help her with the work.

Ms. Alexander, Ms. Alexander received approximately $403,000.00 when her mother died in the form of a direct distribution from her mother's pension plan at the electrical construction company. The funds were not left in trust. Ms. Walsh helped her sister set up an account at a local bank to hold these funds, although Ms. Walsh had no oversight or control over that account. Ms. Walsh apparently believed, incorrectly, that the bank officer who assisted her in opening the account for Ms. Alexander would be "watching over it."

Ms. Colston testified at trial that she became friends with Ms. Alexander at Princess Anne High School, and they would go to happy hours[3] and school functions together. Their relationship progressed and became more involved, and although Ms. Colston denied any romantic interests with Ms. Alexander, she testified she believed Ms. Alexander wanted such a relationship. She further testified that Ms. Alexander was unhappy when Ms. Colston moved to Grayson County, and they continued to communicate with each other extensively by text and Facebook messaging. Ms. Colston also testified that Ms. Alexander would become upset with her if she did not respond as fast as Ms. Alexander expected. On one occasion, Ms. Alexander visited Ms. Colston in Grayson County and left an envelope of money with Ms. Colston when she departed. Ms. Colston stated that she did not ask for the money, but Ms. Alexander wanted her to have it. Recognizing Ms. Alexander had access to substantial funds, and apparently emboldened, Ms. Colston began "receiving" money from Ms. Alexander on a regular basis. Ms. Colston characterized these monetary transfers as gifts. Ms. Alexander believed them to be loans. Ms. Colston said there were times when she tried to pay money back to Ms. Alexander, but she would not accept the money, getting angry when Ms. Colston offered to do so. However,

---

[3] Ms. Alexander also testified that when she went out after school with Ms. Colston, she often "had trouble calculating the tip on the bill" and stated that "[Ms. Colston] would do that for me."

no testimony was elicited of any specific dollar amount offered to be paid back, or the source of the funds.

In whatever fashion she acquired the money, it was apparent that Ms. Colston preyed upon Ms. Alexander's weakness of mind and clear affection for her at the time. From July 2012 to January 2014, Ms. Alexander made 60 monetary transfers to Ms. Colston or entities controlled exclusively by her, totaling $414,590.00. Alexander Exhibits 2 & 3. An additional $39,755.05 in credit card or point of sale purchases were charged to Ms. Alexander as well. *See* Alexander Exhibit 3. These transfers completely depleted the bequest to Ms. Alexander from her mother's pension fund. During this time frame, Ms. Walsh testified Ms. Alexander had lost contact with her family, being highly focused on Ms. Colston. The transfers to Ms. Colston were discovered by Ms. Alexander's family in early 2014, when Ms. Alexander revealed to her older sister, Ms. Walsh, that she was unable to pay her bills. None of these transfers was evidenced by a check, as Ms. Walsh testified at trial that Ms. Alexander did not know how to write checks without assistance. Instead, the vast majority of the transfers were either cash deposits taken by Ms. Alexander from her account and deposited into one of Ms. Colston's accounts, or into accounts of entities controlled by Ms. Colston. Two wire transfers in the amounts of $60,000.00 and $50,000.00, respectively, were made a week apart in November 2013 to Ms. Colston directly. Alexander Exhibit 2. Ms. Alexander stated that Ms. Colston asked for money because she was having financial issues, and she also provided Ms. Colston funds to remodel her home in Grayson County.[4] According to Ms. Colston, some of the funds were used to acquire and

---

[4] The evidence at trial indicated that Ms. Colston had begun a new relationship with Sandra K. Edwards, who was also involved with her general store business. *See* Alexander Exhibit 4. This relationship appears to have soured her relationship with Ms. Alexander. Ms. Edwards is also a creditor in the case, having filed a claim for $5,800.00 for "Money Loaned." *See* Claim No. 3. Ms. Colston testified that she used Ms. Edward's Home Depot card to buy kitchen cabinets and flooring for her Grayson County home. Ms. Edwards did not testify and Ms. Colston stated that their relationship had ended.

remodel the general store property, among other things.[5]  The manner in which these transfers were made, the magnitude and frequency of the transfers, and the Court's own observation of the witnesses' demeanor and testimony on the stand do not lend credibility to Ms. Colston's testimony that these alleged "gifts" were made by Ms. Alexander free from sway by Ms. Colston.

When the family discovered the transfers to Ms. Colston, they started probing Ms. Alexander for information about her dealings with Ms. Colston, of whom Ms. Walsh was becoming clearly suspicious.  Ms. Colston had driven to Virginia Beach to get some beds from Ms. Alexander that formerly belonged to Ms. Alexander's and Ms. Walsh's mother.  Ms. Colston testified that Ms. Alexander contacted her in early 2014 asking about the acquisition of the general store, stating that Ms. Alexander had told her that her sister was "upset" and that she needed something to document her interest in the building "for tax purposes."  Ms. Colston testified that Ms. Alexander had previously offered to buy the building for her, and that Ms. Alexander had declined any offer of ownership.  Ms. Colston indicated she had offered to put Ms. Alexander's name on the building,[6] which was also declined.

Instead, after the transfers came to light, on February 28, 2014, Ms. Colston sent Ms. Alexander a Limited Liability Investment Agreement, backdated to September 27, 2013, purporting to convey to Ms. Alexander an ownership interest in S. Colston Properties, LLC, of "point zero one percent (0.01%)."  Alexander Exhibit 5.  Ms. Colston said that it was Ms.

---

[5] Ms. Colston paid $30,000.00 for the general store, purchasing it from Grayson National Bank.  Another item acquired from the funds obtained from Ms. Alexander was a home generator estimated to have a value of $10,000.00.  The generator, which will be discussed later, was transferred to Ms. Colston's mother by Ms. Colston shortly before filing bankruptcy.  As counsel for Ms. Alexander correctly pointed out at trial, the generator transfer was not disclosed in the Debtor's schedules.
[6] On cross-examination, when questioned about offering Ms. Alexander ownership in the building, Ms. Colston testified that she meant putting Ms. Alexander's name on the title.

Alexander's idea to put the smallest amount possible in the agreement, although Ms. Colston actually suggested the 0.01%. The agreement was not executed, and shortly thereafter, Ms. Walsh retained a law firm in Virginia Beach to investigate the matter.[7]

In late 2013 to early 2014, Ms. Colston was also using Ms. Alexander's credit card, and plying Ms. Alexander for money. Alexander Exhibit 6 is a series of emails between Ms. Colston and Global Restaurant Solutions where Ms. Colston was attempting to charge items to Ms. Alexander's credit card for $6,115.55. The supplier could not verify the charge with Ms. Alexander, the owner of the card, and the order was cancelled. In addition, Alexander Exhibit 7 is a series of text messages from Ms. Colston to Ms. Alexander, including one dated March 20, 2014, reading "I hate to ask but . . . Do you have any money I can borrow till pay day . . . I'm hurting until the 31st . . . i will pay it back I promise. I'm so tight on money I'm even packing food from home to take this weekend instead of eating out." Ms. Alexander's reply was simply, "No." *See* Alexander Exhibit 7. Ms. Colston's text messages to Ms. Alexander continued after Ms. Alexander retained counsel.

On April 23, 2014, Ms. Alexander filed a Complaint in the City of Virginia Beach Circuit Court against Ms. Colston and her three limited liability companies, seeking judgment for fraud in the inducement, undue influence, unjust enrichment, constructive trust, resulting trust, and rescission. *See* Docket No. 43, Alexander Exhibit 1. Ms. Colston retained counsel, discovery was conducted, and a trial date was set for May 26, 2015. On May 11, 2015, Ms. Colston filed the current Chapter 13 case, and on May 21, 2015, she filed an Emergency Motion to Extend Automatic Stay, requesting an expedited hearing for May 22, 2015. A Motion for Default Judgment on an Amended Complaint in the Virginia Beach action was filed and also set for

---

[7] Ms. Alexander's sister now has power of attorney for her and control over her finances.

hearing on May 26, 2015.[8]  The "Emergency Motion" was in reality a request for injunctive

relief, on scant notice to Ms. Alexander's counsel, seeking to enjoin the litigation in Virginia

Beach from going forward against Ms. Colston's limited liability companies.[9]   Notwithstanding

the questionable notice and improper procedural posture of the request, the Court conducted an

evidentiary hearing and the request for injunctive relief was denied.  *See* Docket Nos. 9-11, 14.

The Virginia Beach Circuit Court conducted a hearing on May 26, 2015 at which time it took

evidence, and issued a separate written opinion dated July 2, 2015, and a subsequent Judgment

Order on July 8, 2015.  The Judgment Order and written opinion were entered into evidence as

collective Alexander Exhibit 10.

> In part, the Virginia Beach Circuit Court found as follows:
>
> > In this case, [Ms. Alexander] is entitled to a presumption of undue influence and has sufficiently established a claim for fraud and rescission of the contracts and repayment of her loans and money invested in each of the three entities. While [Ms. Alexander's] incapacity may not rise to the level of legal incompetency, [she] has established she suffers from the continued effects of a brain injury she incurred as a child.  Considering this injury and the relationship that developed between Colston and [Ms. Alexander], it follows that the transactions [Ms. Alexander] entered into were entered under suspicious circumstances with these companies created by Colston, of which Colston was the sole owner and member.  The grossly inadequate consideration of 00.01% interest in the general store in exchange for [Ms. Alexander's] investment of $190,000, given [Ms. Alexander's] great weakness of mind is further support of the findings of undue influence.  Furthermore, the failure of the companies to perform their promise to return the money that was loaned to them in order to induce [Ms. Alexander] to lend the money was also fraudulent.

Alexander Exhibit 10.   The Court found grounds for rescission against all defendants other than

Ms. Colston, and also awarded Ms. Alexander money damages in the amount of $224,905.45.  In

addition, Ms. Alexander obtained an award of attorney's fees of $167,521.61.  Ms. Alexander

---

[8] Ms. Colston's counsel had withdrawn in the Virginia Beach action for non-payment of fees.
[9] The automatic stay of 11 U.S.C. § 362(a) went into effect as to Ms. Colston individually upon filing her petition on May 11, 2015.  One of the grounds for the requested injunctive relief was that Ms. Colston planned to sell property owned by the limited liability companies to pay her individual creditors.

filed a motion before this Court to allow the Virginia Beach Circuit Court to liquidate her claim against Ms. Colston individually, but not to permit enforcement of any judgment, which the Court granted.  Docket No. 46.

On July 31, 2015, Ms. Colston filed an Amended Chapter 13 Plan, providing that Ms. Colston will pay $28,000.00 to unsecured creditors, and that the estimated distribution will be 33%.  Docket No. 38.  In reality, given that Ms. Alexander filed a claim for $621,875.66, $28,000.00 would result in a dividend closer to 4% to unsecured creditors with the other claims filed.[10]  Moreover, in order to make the proposed $955.00 per month payment into the plan, Ms. Colston's 75-year old mother, Martha Boggs ("Ms. Boggs"), would have to commit to making monthly payments to the Chapter 13 Trustee on Ms. Colston's behalf in the amount of $433.00. Ms. Colston's disposable income is not sufficient to make the proposed plan payments on her own, and almost 50% of the regular monthly payments would have to be made by Ms. Boggs for the life of her daughter's plan.[11]  Ms. Boggs testified that she is in good health, that longevity runs in her family, that she has the financial wherewithal to make the payments for the life of Ms. Colston's plan, and that she is willing to do so.  The Chapter 13 Trustee recommended confirmation.[12]

---

[10] Ms. Alexander filed a proof of claim for $621,875.66, listing $74,172.00 as secured.  The basis for perfection is identified as "Filing of Lis Pendens."  Claim 5-1.  However, Ms. Alexander has no judgment against Ms. Colston personally, and has no lien against any property of the estate.  She has a recorded lien against S. Colston Properties, LLC, the owner of the now defunct general store.  The parties stipulated a 60-month plan would provide approximately a 4% dividend based upon claims filed, including Ms. Alexander's claim at $621,875.66.

[11] A previous Chapter 13 plan proposed selling the general store to provide funds for the plan, but Ms. Alexander has a recorded judgment lien against S. Colston Properties, LLC, and that plan provision was removed in the amended plan.  Although Ms. Colston acquired the property for $30,000.00 only a few years ago, it is currently tax assessed at $217,700.00.  This discrepancy in value was unexplained.  Ms. Alexander expects to pursue a creditor's bill in state court to enforce her judgment against that property.

[12] Section 1302(b)(2)(B) provides that "The trustee shall . . . appear and be heard at any hearing that concerns . . . confirmation of a plan."  11 U.S.C. § 1302(b)(2)(B).  Nevertheless, the Court notes the Chapter 13 Trustee's strenuous advocacy in support of the Debtor's plan in this case, particularly at trial.  The best description of the Trustee's position appears similar to that taken in *In re Tomer*, where the Court held that "the Trustee's assessment [was] that the plan was technically sound and therefore, made in good faith."  *Romar Elevators, Inc. v. Tomer (In re*

Ms. Alexander takes a different view. On September 2, 2015, Ms. Alexander filed an

Objection to Confirmation of Modified Chapter 13 Plan and Discharge and Motion to Dismiss

Bankruptcy Case, upon which the Court conducted the hearing on September 16, 2015. Among

other things, Ms. Alexander contends Ms. Colston's Chapter 13 Petition and the Amended

Chapter 13 Plan were filed in bad faith, in violation of 11 U.S.C. §§ 1325(a)(3) and (7),

respectively. Further, she contends the plan is not feasible under 11 U.S.C. § 1325(a)(6) in that

five years of payments dependent upon assistance from her mother for a substantial monthly

contribution is simply too speculative to be feasible. Ms. Colston asserts the Petition and Plan

are both filed in good faith, and that the Plan is feasible. It is with this factual background the

Court decides the issues before it.

<u>CONCLUSIONS OF LAW</u>

Evaluating the good faith requirement for confirmation of a Chapter 13 plan pursuant to

Section 1325(a)(3) is a fact-intensive, case-by-case determination made by the Court based on

the totality of the circumstances. *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986); *Deans

v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982). This case presents a real world conundrum.

Can a person who has engaged in pre-petition misconduct still be "a good debtor?"[13] Are there

circumstances when a debtor who has engaged in significant pre-petition misconduct can

maintain a confirmable Chapter 13 plan? Pre-petition misconduct is but one factor to consider in

---

*Tomer)*, No. 4:09CV008, 2009 WL 2029798, at *5, 2009 U.S. Dist. LEXIS 60261, at *15 (W.D. Va. July 14, 2009).
*Tomer* went on to observe that this mechanical view "blurs the proper duel [*sic*] analysis into a single determination
that imbues itself on the question of whether the petition was filed in good faith. The Trustee is a trustworthy source
with sophisticated technical knowledge of Chapter 13 plan construction. However, the technical sufficiency of a
chapter 13 plan does not necessarily satisfy good faith in filing a bankruptcy petition." *Id.*
[13] *See*, Rebecca B. Connelly, *Can a Debtor who Files Chapter 13 in Bad Faith Survive Dismissal?*, Am. Bankr. Inst.
J. 52, 59 (Feb. 2010). The author of this article was a Chapter 13 trustee at the time it was published and is now
Chief Judge of the United States Bankruptcy Court for the Western District of Virginia.

a totality of the circumstances test, and in the proper case the answer is undoubtedly yes.

However, the Court is not persuaded that this is one of those cases.

## I.     **Burden of Proof**

Section 1325 of the Bankruptcy Code outlines the various requirements for confirmation

of a Chapter 13 plan.  Included among those are requirements that the plan be filed in good faith,

that the debtor will be able to make all payments under the plan and to comply with the plan, and

that the action of the debtor in filing the petition be in good faith.  11 U.S.C. §1325(a)(3),(6), and

(7).  The second requirement above is generally referred to the "feasibility" requirement.   Ms.

Alexander's objection and motion to dismiss implicate all three of these requirements in this

case.  As stated in *In re Tomer*, "[t]he obligation of good faith is imposed on the debtor at two

stages in a Chapter 13 proceeding; first, the debtor must file the petition for Chapter 13

bankruptcy in good faith, and second, the debtor must file the Chapter 13 plan in good faith."  *In

re Tomer*, 2009 WL 2029798, at *4, 2009 U.S. Dist. LEXIS 60261, at *12 (citing *In re Smith*,

286 F.3d 461, 465 (7th Cir. 2002); *In re McFadden*, 383 B.R. 386, 388-89 (Bankr. D.S.C. 2008);

*In re Bowen*, No. 07–05485-JW, 2008 Bankr. LEXIS 16, at *6 (Bankr. D.S.C. Jan. 9, 2008)).

The debtor bears the burden of proof at confirmation, including as to good faith.  *In re

Taylor*, 261 B.R. 877, 885 (Bankr. E.D. Va. 2001).  The burden of proving the "good faith" filing

of a Chapter 13 plan under Section 1325(a)(3), distinct from the burden under Section 1307(c),[14]

is plainly on the debtor.  *In re Love*, 957 F.2d at 1355.  Section 1325(a)(3) provides that "the

court shall confirm a plan if—. . . the plan has been proposed in good faith and not by any means

forbidden by law."  11 U.S.C. § 1325(a)(3).  Thus, the debtor bears the burden of proving by a

---

[14] Section 1307(c) provides that a petition may be dismissed "for cause," which courts have interpreted to mean that
the party moving for dismissal must demonstrate cause, not that the debtor must show an absence of cause.  *In re
Love*, 957 F.2d 1350, 1355 (7th Cir. 1992).

preponderance of the evidence that a plan is proposed in good faith under Section 1325(a)(3).
*See In re Harrison*, 203 B.R. 253, 255 (Bankr. E.D. Va. 1996); *see also Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth)*, 455 B.R. 904, 918 (B.A.P. 9th Cir. 2011).

Likewise, at confirmation, a debtor also has the burden of proof under 11 U.S.C. § 1325(a)(7) to establish that "the action of the debtor in filing the petition was in good faith."  11 U.S.C. § 1325(a)(7).  As stated in *In re Ellsworth*, "[i]t is thus true now that the debtor, as plan proponent, has the burden of proof on the confirmation issues of whether both the case *and* the plan were filed in good faith."  455 B.R. at 918 (emphasis in original).  Section 1325(a)(7) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Because this code section is relatively new, case law is still evolving. In *In re Bateman*, the court indicated that, in the context of Section 1307(c), the "proper good faith inquiry is 'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter] in the proposal or plan.'"  *Branigan v. Bateman (In re Bateman)*, 515 F.3d 272, 283 (4th Cir. 2008) (quoting *Deans v. O'Donnell*, 692 F.2d 968, 972 (4th Cir. 1982)).  *See also In re Bland*, No. 06-1159, 2008 WL 2002647, at *3, 2008 Bankr. LEXIS 1331, at *7 (Bankr. N.D. W. Va. May 6, 2008).  Because the analytics of Sections 1325(a)(3) and (7) are not identical, the Court will address them separately.

**A.  <u>Section 1325(a)(3) Factors</u>**

It is well established that in the Fourth Circuit a totality of the circumstances test is used for determining whether a Chapter 13 plan has been proposed in good faith.  The "totality of the circumstances" test was originally set forth in *Deans v. O'Donnell*, 692 F.2d at 972, and expanded in *In re Solomon*, 67 F.3d 1128, 1134 (4th Cir. 1995), and *Neufeld v. Freeman*, 794 F.2d at 152.  The non-exclusive factors to be considered include the following:

11

(1) the percentage of proposed repayment to creditors;
(2) the debtor's financial situation;
(3) the period of time over which creditors will receive payment;
(4) the debtor's employment history, and current and future employment prospects;
(5) the nature and amount of unsecured claims;
(6) the debtor's past bankruptcy filings;
(7) the debtor's honesty in disclosing facts of the case;
(8) the nature of the debtor's pre-petition conduct that gave rise to the case;
(9) whether the debts would be dischargeable in a Chapter 7 proceeding; and
(10) any other unusual or exceptional problems the debtor faces.

The foregoing factors are each still relevant in cases following BAPCPA.  *In re Edmunds*, 350

B.R. 636, 649 (Bankr. D.S.C. 2006).   Accordingly, the factors of the percentage of proposed

repayment and debtor's actual financial situation at the time of filing are still elements of good

faith.  *Id.* at 648-49.  Courts have "at least implicitly view[ed] substantial repayment" to

unsecured creditors "as an essential element of 'good faith.'"  *Deans v. O'Donnell*, 692 F.2d at

970 (citing *In re Rimgale*, 669 F.2d 426 (7th Cir. 1981); *In re Terry*, 630 F.2d 634 (8th Cir.

1980)).

    In this case, the Court finds that the Debtor has not met her burden under Section

1325(a)(3) of proving that her plan was proposed in good faith.  Several factors warrant this

conclusion.  First, Ms. Colston's proposal to pay unsecured creditors an estimated distribution of

33% in her Chapter 13 Plan is illusory.  Ms. Alexander has filed a claim in the amount of

$621,875.66, which has not been objected to and for present purposes is deemed allowed.  *See* 11

U.S.C. § 502(a).  Factoring in that claim brings the proposed dividend to unsecured creditors

closer to 4%.  Based on the unsecured claims filed to date, and excluding the claim of Ms.

Colston's mother (who is providing approximately half the funding for this case), Ms.

Alexander's claim comprises 96.8% of the claimant pool.[15]  "Such a nominal payment on a

---

[15] The claims register reflects that, excluding Ms. Colston's mother's claim of $48,000.00, there is $642,466.20 in unsecured claims filed to date.  Ms. Alexander's claim of $621,875.66 comprises 96.8% of that class.

potentially nondischargeable claim is evidence of bad faith." *In re Herndon*, 218 B.R. 821, 825 (Bankr. E.D. Va. 1998).

The elements of (i) "the nature and amount of unsecured claims," (ii) "the nature of the debtor's pre-petition conduct that gave rise to the case," and (iii) "whether the debts would be nondischargeable in a chapter 7 proceeding" can be taken together.  The Fourth Circuit in *Neufeld v. Freeman* specifically referred to a debtor's prepetition conduct and the possible nondischargeability (under Chapter 7) of objecting creditors' claims as factors "a majority of the courts addressing the [good faith inquiry] have expressly considered."  794 F.2d at 152.[16]  As the testimony and the claims register made clear, this is a two-party dispute.  Ms. Colston would not be before this Court had Ms. Alexander's family not discovered her siphoning off Ms. Alexander's inheritance.  The timing of the petition filing in relation to the pending state court trial date, and Ms. Colston's own testimony, reflect that this case was filed for the sole purpose of impeding Ms. Alexander and her family from attempting to recover the assets taken by Ms. Colston.  While the Court recognizes that a confirmation hearing should not be converted into a nondischargeability trial, the Court finds that Ms. Alexander has presented compelling evidence that that there is a substantial likelihood the debt she seeks to recover would be declared nondischargeable in a Chapter 7 proceeding.  Ms. Colston did not present evidence sufficient to persuade the Court otherwise.  In fact, Ms. Colston's testimony on the stand was unremorseful, bordering on defiant in the belief that she did anything wrong.

Moreover, Ms. Colston has engaged in post-petition activity, namely falling short on her disclosure obligation, that does not reflect that she fully appreciates the burdens upon her as a

---

[16] "Resort to the more liberal discharge provisions of Chapter 13, though lawful in itself, may well signal an 'abuse of the provisions, purpose or spirit' of the Act, especially where a major portion of the claims sought to be discharged arises out of pre-petition fraud or other wrongful conduct, and the debtor proposes only minimal repayment of these claims under the plan."  *Neufeld*, 794 F.2d at 153.

debtor in this Court.  Ms. Colston's petition was filed on May 11, 2015.  Her Schedules and

Statement of Financial Affairs ("SOFA") were filed on May 22, 2015.  Docket No. 15.  Her

Schedule B, Personal Property reflects no interest in a valuable home generator that she

purchased with funds obtained from Ms. Alexander.  However, her SOFA required her to

address the following statement:  "List all other property, other than property transferred in the

ordinary course of business or financial affairs of the debtor, transferred either absolutely or as

security within two years immediately preceding the commencement of the case."  SOFA at 5.

Ms. Colston answered "None."  To date, this schedule has not been amended.  At trial, upon

questioning by Ms. Alexander's counsel, it became apparent that Ms. Colston transferred the

home generator to her mother a short time before filing this case, allowing her to take a

$10,000.00 credit against a debt she allegedly owes her mother, reducing the debt from

$58,000.00 to $48,000.00.  Ms. Colston also failed to disclose this transfer under the "Payments

to creditors" section of her SOFA as well.  SOFA at 2.  While the generator is not of

extraordinary value, the failure to disclose this transfer without probing by opposing counsel is

not consistent with good faith, but is more consistent with Ms. Colston's focus on protecting

herself, and to a lesser extent, her mother.  It is also not consistent with a focus on repayment of

her creditors or her responsibilities as a debtor.  "Neither the trustee nor the creditors should be

required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight."

*In re Bland*, 2008 WL 2002647, at *3, 2008 Bankr. LEXIS 1331, at *8 (citing *Boroff v. Tully (In

re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)).

The Court is mindful that the mere presence of a nondischargeable debt is not a barrier to

Chapter 13 confirmation.  The Bankruptcy Code contemplates that Chapter 13 can and should be

available even to those whose pre-petition misdeeds are the source of their current financial

problems.  Indeed, Section 1328(a)(2) specifically does not include debts nondischargeable

under 11 U.S.C. § 523(a)(6)[17] as included in the class of debts excepted from a Chapter 13

discharge.[18]  *See* 11 U.S.C. § 1328(a)(2).  Whereas debts under Sections 523(a)(2) and (4), once

properly litigated and established under 11 U.S.C. § 523(c), are excepted from discharge, Section

523(a)(6) debts are not.  This reflects Congress's intent that, in a proper case, the "super

discharge" of pre-BAPCPA survives and a Section 523(a)(6) debt can be discharged in Chapter

13.  This does not mean, however, the presence of a potential Section 523(a)(6) claim cannot or

should not be considered under a good faith analysis.  The presence of other factors, such as a

meaningful dividend to unsecured creditors (including ones with potentially nondischargeable

debts), an extended plan repayment period over the minimum required,[19] and the absence of any

post-petition or filing misconduct may counterbalance and in fact weigh in favor of confirmation,

possibly heavily so.  This is consistent with Fourth Circuit precedent providing that "[a] Chapter

13 plan may be confirmed despite even the most egregious pre-filing conduct *where other*

*factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy*

*his creditors' claims*."  *Neufeld*, 794 F.2d at 153 (emphasis added).  Those "other factors" simply

do not exist here in a manner sufficient to support confirmation.

Therefore, because of the Debtor's prepetition *and* post-petition conduct, the lack of a

meaningful dividend to unsecured creditors, and the nature of likely non-dischargeable debt to

Ms. Alexander, the Court finds that the Debtor has not met her burden of proving good faith

---

[17] Section 523(a)(6) provides that a discharge under 11 U.S.C. § 727 does not discharge an individual debtor of a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

[18] At least one court has held that facts supporting an undue influence case can maintain a nondischargeability action under 11 U.S.C. § 523(a)(6).  *See Necaise v. Necaise (In re Necaise)*, Case No. 11-52718-KMS, A.P. No. 12-05011-KMS, 2013 WL 4590890, 2013 Bankr. LEXIS 3601 (Bankr. S.D. Miss. Aug. 28, 2013).

[19] Ms. Colston has proposed a 60-month plan, even though her B22 reflects she is a below median income debtor and is eligible for a shorter plan.  *See* Trustee's Exhibit 5.  This is a factor in her favor, as is the fact she has filed no previous bankruptcy petitions, but these facts are not enough to persuade the Court the good faith burden is met here.

pursuant to Section 1325(a)(3), and thus, confirmation of the Debtor's Chapter 13 Plan is

denied.[20]

### B. Section 1325(a)(7) Factors

In addition to the good faith required in the filing of the plan as stated above, good faith

is also required in the filing of the Chapter 13 petition. *See* 11 U.S.C. § 1325(a)(7). The 2005

addition of Section 1325(a)(7) in BAPCPA has vexed courts and commentators regarding how

the provision interacts with Section 1325(a)(3) and Section 1307(c).[21] As one commentator has

noted, the addition of Section 1325(a)(7) may have "had more to do with resolving a judicial

split over whether prepetition conduct should be considered in determining good faith rather than

with codifying the court's dismissal authority" considering that "some courts excluded

prepetition conduct from the pre-BAPCPA plan good-faith analysis."[22] Under Section

1325(a)(7), "if a lack of good faith in filing a chapter 13 petition mandates a denial of

confirmation, it would appear that this defect would be irremediable," and "[i]f so, a chapter 13

case in which the debtor is unable to confirm any plan warrants dismissal under section 1307(c)."

*In re Manno*, 2009 WL 236844, at *7 n.9, 2009 Bankr. LEXIS 142, at *22 n.9 (citing *Carolin

Corp. v. Miller*, 886 F.2d 693, 700-01 (4th Cir. 1989)).

---

[20] Because the Court finds confirmation of the Debtor's plan is not appropriate under Section 1325(a)(3), the Court need not reach the question of feasibility under 11 U.S.C. § 1325(a)(6). However, the Court agrees with those Courts that have held that "some gratuitous contributions are allowed, particularly when the funds come from a non-filing spouse or pursuant to a legal obligation." *See In re Page*, 519 B.R. 908, 915 (Bankr. M.D.N.C. 2014), and cases cited therein. Depending on the facts of a given case, a family member's gratuitous payments to a debtor may not constitute "regular income" within the scope of 11 U.S.C. § 109(e).

[21] *See, e.g., In re Manno*, No. 08-15588BF, 2009 WL 236844, at *7 n.9, 2009 Bankr. LEXIS 142, at *22 n.9 (Bankr. E.D. Pa. Jan. 30, 2009) (discussing the confusion among courts following the enactment of 11 U.S.C. § 1325(a)(7) and its interaction with 11 U.S.C. § 1307(c)); *Bloomberg Bankruptcy Treatise*, Part VII: Adjustment of Debts of Individuals with Regular Income, Chapter 232: Bankruptcy Code § 1325 - Confirmation of Plan (BNA 2015) ("Few courts have had occasion to interpret section 1325(a)(7) and there is scant legislative history to suggest why Congress added the new provision.").

[22] Connelly, *supra* note 13, at 53.

16

Like under Section 1325(a)(3), the debtor "bears the burden of proving, by a preponderance of the evidence, that her plan was proposed in good faith" under Section 1325(a)(7). *In re Page*, 519 B.R. at 913-14 (internal citations omitted).  However, "[u]nder § 1307(c), the party seeking to dismiss the debtor's case has the burden of proving that the debtor's bad faith warrants dismissal." *Id.* at 913 (citing *Love*, 957 F.2d at 1355).  Thus, where the debtor does not meet her burden of proving her Chapter 13 petition was filed in good faith under Section 1325(a)(7), denial of plan confirmation is the appropriate remedy, whereas where the movant proves by a preponderance of the evidence that the debtor filed her bankruptcy petition in bad faith under Section 1307(c), dismissal or conversion of the case is warranted.

While limited guidance exists on what a debtor must prove to obtain confirmation under Section 1325(a)(7), the standards used in a Section 1307(c) good faith analysis are helpful.  *See In re Bland*, 2008 WL 2002647, at *3, 2008 Bankr. LEXIS 1331, at *8; *In re Tomer*, 2009 WL 2029798, at *4-5, 2009 U.S. Dist. LEXIS 60261, at *12-15.  Moreover, the debtor's intent is central to determining good faith in the filing of a petition, but less so when considering confirmation of the Chapter 13 plan.  *Tomer*, 2009 WL 2029798, at *5, 2009 U.S. Dist. LEXIS 60261, at *17.  Factors generally accepted in determining good faith under Section 1307(c) include:  "the nature of the debt, including the question of whether the debt would be nondischargeable in a chapter 7 proceeding; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors."  *Love*, 957 F.2d at 1360.  "Ultimately, at the heart of the inquiry is 'whether the filing is fundamentally fair to creditors and, more generally, is . . . fundamentally fair in a manner that complies with the Bankruptcy Code."  *In re Dickenson*, 517

B.R. 622, 634 (Bankr. W.D. Va. 2014) (citing *Love*, 957 F.2d at 1357). This is consistent with

the Fourth Circuit's more holistic statement in *In re Bateman* that the "proper good faith inquiry

is 'whether or not under the circumstances of the case there has been an abuse of the provisions,

purpose, or spirit of [the Chapter] in the proposal or plan.'" *Bateman*, 515 F.3d at 283 (quoting

*Deans*, 692 F.2d at 972).

Numerous courts have applied the *Love* factors to good faith in the context of a Chapter

13 petition. *In re Uzaldin*, 418 B.R. 166, 173-74 (Bankr. E.D. Va. 2009) (citing *Love*, 956 F.2d

at 1355). In *Uzaldin*, the court stated as follows:

> Situations where a debtor seeks to misuse the Bankruptcy Code to hinder or
> prejudice one particular creditor and where the underlying debt could be
> nondischargeable have been addressed in other cases. In one, the debtor filed a
> chapter 7 petition and announced his intention to pay every debt except his
> support and equitable distribution obligations owed to his former spouse. The
> Fourth Circuit upheld the dismissal of his case as an abuse of the bankruptcy
> process. *In re Kestell,* 99 F.3d 146 (4th Cir. 1996). In another, the debtor owed
> money to a creditor whom he had assaulted and who had obtained a judgment
> against him. The court found that the motivation for filing the petition was solely
> to hinder and delay collection of the debt by the creditor. The filing was not
> precipitated by any negative financial event. The chapter 13 case was dismissed
> with prejudice. *In re Shaheen,* 268 B.R. 455 (Bankr. E.D. Va. 2001). In a third
> case, the debtor listed on her schedules in her chapter 13 case money allegedly
> owed due to her fraud and embezzlement. The embezzlement claim constituted by
> far the largest unsecured debt of the debtor. The court dismissed her case because
> of the likely nondischargeability of the embezzlement claim and the relatively
> small six-percent distribution proposed in her chapter 13 plan. *In re Herndon,* 218
> B.R. 821 (Bankr. E.D. Va. 1998).

*In re Uzaldin*, 418 B.R. at 174. *See also In re Bland*, 2008 WL 2002647, at *3-5, 2008 Bankr.

LEXIS 1331, at *8.

This case has the hallmarks of a petition not filed in good faith. Not unlike in *In re*

*Shaheen*, where the debtor's motivation was solely to hinder and delay collection efforts by a

creditor, the Debtor in the instant case filed her bankruptcy petition shortly before the scheduled

trial date of the Virginia Beach Circuit Court action in order to avoid an adverse judgment against her individually. That, in itself, is not unusual. If every two-party dispute resulting in litigation automatically resulted in a bad faith filing, there would be little for this Court to do. However, the last minute filing coupled with a *de minimis* offering to Ms. Alexander on her claim based on a potentially, if not highly likely, nondischargeable undue influence debt does support a finding of lack of good faith. Ms. Colston's lack of disclosure about the generator transfer bolsters that point. Ms. Colston's *intent* in filing this case is manifest. Her design was to stop Ms. Alexander from attempting to recover what was improperly taken from her, and setting good faith aside under Section 1325(a)(3), confirm a plan using contributions from her mother that would put Ms. Alexander in her past by paying Ms. Alexander the bare minimum the law would permit in an effort to confirm a plan and get a discharge. The circumstances of this case call for far more.

Concluding that Ms. Colston has filed her petition with a lack of good faith, the Court must determine the proper remedy. Because Section 1325(a)(7) arises in the context of confirmation, "Congress has presumably indicated that denial of confirmation, rather than dismissal, is the appropriate way to prevent such conduct." 8 *Collier on Bankruptcy* ¶ 1325.08, at 1325-51 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 16th ed. rev. 2014). However, under Section 1307(c), the Court may dismiss a case, or convert a case to one under Chapter 7, whichever is in the best interest of creditors, "for cause," including "denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan." 11 U.S.C. § 1307(c)(5). The Debtor has proposed two unsuccessful plans. The first proposed to sell a piece of real estate not owned by the Debtor, but owned by one of her limited liability companies. When it became apparent the state court

litigation would go forward and that was no longer an option, the Debtor proposed the most

recent plan.  The Court concludes that authorizing additional time to file a second amended plan

is not in the best interests of creditors as such a plan would no doubt suffer the same infirmities

of the last plan.  *See In re Keith's Tree Farms*, 519 B.R. 628, 643 (Bankr. W.D. Va. 2014), *aff'd*,

*Keith's Tree Farms v. Grayson Nat'l Bank*, 535 B.R. 647 (W.D. Va. 2015).  As stated by the

District Court in *Keith's Tree Farms*,[23] "'Bankruptcy courts are given a great deal of discretion

to say when enough is enough' when it comes to granting or denying the opportunity to amend

reorganization plans."  535 B.R. at 653 (citing *Matter of Woodbrook Assocs.*, 19 F.3d 312, 322

(7th Cir. 1994)).

Because further amendment of the plan would be fruitless given the facts before the

Court, the Court believes dismissal is appropriate at this juncture.[24]  Ms. Colston has limited

assets and limited income.  Ms. Colston's primary creditors are Ms. Alexander, the holder of the

mortgage on her house, her mother, an ex-girlfriend, and the law firm formerly representing her

in the litigation with Ms. Alexander.  The evidence reflects the only creditor seriously pressing

her is Ms. Alexander.  Increasing her contribution to an amended plan from her own income

sources is unlikely given the evidence before the Court.   Given that over half the funding from

her "bare minimum" plan is proposed to come from monthly gifts from her mother, some of

which would go right back to her mother in the form of a distribution on her own claim, it is

unlikely that Ms. Colston could propose a more advantageous plan for the repayment of her

debts.  The Court believes the best remedy for the Debtor's lack of good faith in filing her

---

[23] *Keith's Tree Farms* interpreted 11 U.S.C. § 1208(c)(5) as opposed to Section 1307(c)(5), but the provisions are virtually identical.

[24] Dismissal is also consistent with 11 U.S.C. § 105(a), which allows the Court to "issue any order that is necessary to carry out the provisions of the Code."  While the Debtor has not made a formal request "for additional time for filing another plan or a modification of a plan," the Court will not require the Debtor to do a useless act.  *See In re Marett*, No. 96-75003-W, 1996 WL 33340790, at *13 (Bankr. D.S.C. Nov. 13, 1996) ("[Where] no plan which the debtor could propose would be feasible," the case should be dismissed without leave to amend.).

Chapter 13 petition is to dismiss her Chapter 13 case under Section 1307(c)(5).  Further, as Ms.

Colston does not appear to have significant assets to be liquidated for the benefit of her creditors,

and there is no allegation of any significant avoidable transfers to be recovered for the estate

(other than the potential generator transfer), the Court does not believe that conversion to

Chapter 7 is in the best interests of her creditors.  With the passage of time, should Ms. Colston

gain more lucrative employment or obtain additional assets from which she can refile and

perhaps file a more meaningful plan, she is not precluded from doing so.[25]  As the Court will

dismiss the case under its own volition, the Court need not reach Ms. Alexander's motion to

dismiss.

CONCLUSION

For the foregoing reasons, the Court will deny confirmation of Ms. Colston's Chapter 13

Plan and dismiss her bankruptcy case by Order entered contemporaneously herewith.

**Decided this 14th day of October, 2015.**

_____
UNITED STATES BANKRUPTCY JUDGE

---

[25] Chapter 13 relief may or may not be available to Ms. Colston, depending on the amount of her noncontingent, liquidated unsecured debts at the time she files.  The claim against her personally has yet to be liquidated in state court.   The current limit on such unsecured debt is $383,175.00.  11 U.S.C. § 109(e).